**HAGENS BERMAN SOBOL SHAPIRO LLP**
Robert B. Carey # 011186
Leonard Aragon # 020977
2425 East Camelback Road, Suite 650
Phoenix, Arizona 85016
Facsimile: (602) 840-3012
Telephone: (602) 840-5900
E-mail: rob@hbsslaw.com
        leonard@hbsslaw.com

**GRANT WOODS, P.C.**
J. Grant Woods # 006106
1726 North Seventh Street
Phoenix, Arizona 85006
Telephone: (602) 258-2599
Facsimile: (602) 258-5070
E-mail: gw@grantwoodspc.net

Attorneys for Plaintiff Byrl Lane

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| BYRL LANE, on behalf of himself and all others similarly situated,<br><br>                    Plaintiff,<br><br>          v.<br><br>LIFELOCK, INC., a Delaware Corporation,<br><br>                    Defendants. | No. CV-08-594<br><br>**CLASS ACTION COMPLAINT**<br>(Consumer Fraud, Rescission, and False Advertising)<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, by and through his attorneys, Hagens Berman Sobol Shapiro LLP and Grant Woods, P.C., allege upon personal knowledge as to his own acts, and upon information and belief based on investigation of counsel as to all other matters, as follows:

## I.    NATURE OF THE ACTION

1.    This action arises out of LifeLock, Inc.'s ("LifeLock") false, misleading and fraudulent misstatements, and material omissions regarding its ability to protect consumers from identity theft.  Defendant's actions have injured thousands of individuals across the

country by unlawfully inducing them to enter into contracts that violate federal law and do not provide the promised protections.

2.  LifeLock advertises itself as providing a proactive identity theft prevention service by stating that it provides a "proven solution" that can prevent identity theft before it happens, and promises to guarantee its services up to $1,000,000.00.

3.  LifeLock, however, misleads consumers as to the nature of its alleged "guarantee" and fails to inform consumers that its (1) $1,000,000.00 "guarantee" is virtually worthless because it is riddled with restrictions, waivers, and limitations, (2) LifeLock does not require entities extending credit to contact consumers to verify their identity prior to extending new credit, (3) LifeLock cannot, by law, perform the services it promises to perform, (4) LifeLock's $1,000,000.00 guarantee is an insurance product that must comply with the Arizona Insurance Code, but LifeLock fails to even attempt to comply with the Insurance Code's rules and regulations, and (5) statements by LifeLock's CEO regarding the ability of LifeLock to protect his own identity are, at best, misleading because his identity was stolen while he was a customer.

4.  With approximately one million customers, each paying ten dollars per month for their LifeLock "protection," LifeLock is earning around $120 million dollars a year in revenue (and this number was growing rapidly even prior to the company's recent, extensive advertising campaign) on the premise of misleading and deceptive claims and omissions about the effect of fraud alerts, the coverage LifeLock will provide in the event of an identity theft, and the legality of LifeLock's business practices.  As it is, approximately one million consumers pay over $100 per year thinking and believing that they have certain protections from theft and certain benefits in the event of a theft, when in fact they have neither.

5.  LifeLock's conduct violates the Arizona's Consumer Fraud Act, the Arizona Insurance Code, and constitutes negligent misrepresentation and breach of contract. Plaintiff and class members have sustained damages as a result of LifeLock's false and

misleading statements and material omissions, and are entitled to, among other things, rescission and punitive damages.

## II.     THE PARTIES

6.     Plaintiff is a resident of Maricopa County, Arizona.

7.     Defendant LifeLock is a Delaware corporation with its principal place of business at 60 East Rio Salado Parkway, Tempe, Arizona, 85281.

## III.     JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action under the Class Action Fairness Act of 2005, which, *inter alia,* amends 28 U.S.C. § 1332 to add a new subsection (d) conferring federal jurisdiction over class actions where, as here, "any member of a class is a citizen of a State different from any other Defendant," and the aggregated amount in controversy exceeds five million dollars ($5,000,000).  *See* 28 U.S.C. § 1332(d)(2), (6).

9.     This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of the Court that Defendant has its principle place of business in Tempe, Arizona and, upon information and belief, Defendant's conduct that gives rise to this complaint, as further described below, was created, ratified, and implemented from its corporate offices located in Tempe, Arizona.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendant, as a corporation, is "deemed to reside in any judicial district in which [it is] subject to personal jurisdiction" and because the misrepresentations and material omissions "giving rise to the claims[s] occurred" in this District.

## IV.     STATEMENT OF FACTS

11.     LifeLock, founded in 2005, claims on its website that it is "the industry leader in proactive identity theft protection," that it "offers a proven solution that prevents your identity from being stolen before it happens," and that it will "protect your identity and

3

1  personal information for only $10 a month - and we guarantee our service up to

2  $1,000,000."

3      12.    LifeLock's advertisements feature Todd Davis, a founder of LifeLock, giving

4  out his real social security number.  In its video advertisements, Todd Davis – who the

5  advertisement indicates is the CEO of LifeLock – drives around announcing his social

6  security number over a loud speaker in a van that has the number painted on the side, and

7  hands out sheets of paper with the number on them.  He states, "I'm Todd Davis, and I'm

8  here to prove just how safe your identity can be with LifeLock.  That's my real social

9  security number."  A voice-over announcer then states that "LifeLock helps keep your

10 personal information safe, even in the wrong hands."  LifeLock's print advertisements

11 similarly feature Todd Davis and his social security number.  In one, the text reads, "I'd be

12 worried too – if I didn't have LifeLock."  Another, run in the New York Times, states, "The

13 fact is another identity is stolen every three seconds, but I still put my personal information

14 out there for the world to see because of my complete confidence in LifeLock's ability to

15 protect my identity."

16     13.    Proving the fallacy of LifeLock's claims, Davis' identity was stolen in 2006

17 while he was a LifeLock customer.  A Texas man secured a $500.00 payday loan using

18 Davis' social security number.  Nevertheless, LifeLock continues to run advertisements

19 claiming that Davis knows his identity is safe with LifeLock, without disclosing that his

20 identity has in fact been stolen as a result of the disclosure.

21     14.    Nor does LifeLock disclose that the previous credit-related company of one

22 of its founders, Robert J. Maynard, Jr., was investigated and prosecuted for fraud and

23 misrepresentation by both the State of Arizona and the Federal Trade Commission.  As a

24 result, the company was required by a judge to stop conducting business in Arizona, and

25 the FTC banned Maynard for life from "advertising, promoting, offering for sale, selling,

26 performing, or distributing any product or service relating to credit improvement services."

27 Although Maynard resigned as CEO of LifeLock following news reports detailing his past

28 financial problems, including allegations that he stole his father's identity, he continued to

4

work with the company as a consultant. LifeLock does not disclose to its customers its former CEO's conduct or his continued relationship to LifeLock.

15.     LifeLock's purported "proven solution" consists of illegally placing and renewing fraud alerts under consumers' names with credit bureaus. LifeLock, however, fails to inform consumers of the illegality of its actions and the scope and effectiveness of fraud alerts.

16.     Under the federal Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681c-1(a), a credit reporting agency must place an initial 90-day fraud alert on the file of a consumer, "[u]pon the direct request of a consumer, or an individual acting on behalf of or as a personal representative of a consumer," where the consumer has a good faith suspicion that he or she is, or is about to be, the victim of a fraud or related crime, including identity theft. The FCRA defines a consumer as an individual. 15 U.S.C. § 1681a(c).

17.     Under the statutory language, only an individual is allowed to place a fraud alert, either for themselves, or acting on behalf of or as a personal representative of another individual. The statutory language intentionally excludes corporations such as LifeLock from placing fraud alerts. As the legislative history states, the statute "use[s] the word 'individual' instead of 'person' to ensure that the provision would only apply to specific individuals such as a consumer's authorized family members or guardians (or attorneys acting as personal representatives), authorized representatives from bona fide military services organizations, ***and not to companies and entities such as credit repair clinics***." *See* H.R. Rep. No. 108-263 at 40 (Sept. 4, 2003) (emphasis added). Therefore, a company such as LifeLock cannot be a personal representative or act on behalf of a consumer for the purposes of placing a fraud alert under the FCRA.

18.     Fraud alerts provide limited protection against only certain types of identity theft and fraud. When a fraud alert is in place, it alerts creditors accessing the consumer's credit report that the consumer does not authorize the establishment of any new credit accounts, the issuance of an additional card on an existing credit account, or any increase in the credit limit on an existing credit account. 15 U.S.C. § 1681c-1(h)(1)(A). A creditor

using the credit report may only approve such transactions if the user "utilizes reasonable policies and procedures to form a reasonable belief that the user knows the identity of the person making the request." If the consumer has provided a telephone number for verification purposes, the user of the report must either contact the consumer at that number *or* "take reasonable steps to verify the consumer's identity and confirm that the application for a new credit plan is not the result of identity theft." 15 U.S.C. § 1681c-1(h)(1)(B). Fraud alerts do not protect consumers against identity theft involving the use of existing accounts, or the opening of accounts that do not require accessing a credit report – as in the theft of Davis' identity.

19.     However, in selling its purported protection scheme, LifeLock misrepresents the availability, purpose and scope of fraud alerts in several material ways, including:

a.     failing to inform consumers that under the FCRA, a corporation such as ***LifeLock cannot lawfully place fraud alerts*** on the consumers' behalf;

b.     failing to inform consumers that under the FCRA, an initial fraud alert may be placed by a consumer or an individual acting on their behalf ***only*** when the consumer has a good faith suspicion that the consumer is or is about to be the victim of a fraud or related crime, including identity theft;

c.     implying that any of the reasons given on its website – such as the viewing of news reports or the desire to receive less junk mail – are valid reasons for requesting a fraud alert;

d.     indicating that consumers are entitled to perpetually renew the 90-day fraud alert, in contradiction of the FCRA; and

e.     stating that creditors will be required to call the consumer before opening a new line of credit, even though not all creditors will even know there is a fraud alert on file and even those who are aware of the alert may take other reasonable steps to verify the consumer's identity.

20.     LifeLock also assures consumers that, "Fraud alerts do not affect your creditworthiness or your credit rating, either in actuality or perception, and as long as you

are reasonably available at the phone number listed in the alert, you should not lose the ability to apply for credit." But perpetual renewal of fraud alerts can affect a consumer's creditworthiness and, upon information and belief, can actually reduce a consumer's credit score or cause lenders to consider the consumer a credit risk. LifeLock fails to disclose these material facts to consumers.

21.     Likewise, consumers could lose their ability to apply for credit when they are unable to be reached at the phone number they provided or when vendors choose to turn down the application rather than complying with the requirements of a fraud alert. LifeLock fails to disclose these material facts to consumers.

22.     LifeLock's advertisements and promotions, individually and in the aggregate, misrepresent, among other things, that (1) LifeLock has the authority to lawfully place fraud alerts on behalf of consumers, (2) LifeLock possesses a special expertise or ability to place such alerts that consumers do not possess, (3) all consumers are entitled to such fraud alerts even if they do not have a good faith suspicion that they are about to be the victim of a fraud or related crime, (4) all consumers are entitled to perpetual renewal of such fraud alerts regardless of circumstances, (5) LifeLock's services in placing fraud alerts will effectively "lock" an individual's identity and protect them from identity theft, and (6) the perpetual renewal of fraud alerts will have no effect on the consumer's creditworthiness, credit rating or ability to secure credit.

23.     LifeLock further misleads customers by stating that part of its service consists of ordering credit reports for its members, without adequately disclosing to the consumer that (1) they have a right to obtain free credit reports once a year, (2) LifeLock is charging the consumer to order the consumer's free credit reports, and (3) the consumer will not be able to access free credit reports once LifeLock has done so.

24.     LifeLock also misrepresents the scope of its alleged $1,000,000.00 guarantee, dramatically overstating the actual value of its services and its alleged guarantee. In its commercials, Todd Davis is featured announcing to a crowd of individuals, "If anything happens for any reason while you're a client of LifeLock, ***we will cover all losses and all***

*expenses up to one million dollars*." (emphasis added.) In response to Davis' statement, a man is featured asking, "You're going to protect me for one million dollars?"

25.     Similarly, LifeLock states on its website that: "If your Identity [sic] is misused while you are a member of LifeLock, we'll spend up to $1,000,000 to make it right." It further states:

> If your Identity [sic] is stolen while you are a member of LifeLock, we're going to do whatever it takes to recover your good name. If you need lawyers, we're going to hire the best we can find. If you need investigators, accountants, case managers, whatever, they're yours. *If you lose money as a result of the theft, we're going to give it back to you*. We will do whatever it takes to help you recover your good name and we will spend up to $1,000,000 to do it.

(emphasis added).

26.     LifeLock has caused similar misrepresentations to be repeated elsewhere. For example, the website www.lifelockreviews.com, which repeatedly links to LifeLock's own website and offers discounts on LifeLock membership, states that LifeLock allows users to "be assured of up to $1 million guarantee against any losses from the loss of identify while being their client."

27.     However, the terms and conditions of the actual guarantee reveal that it provides much narrower protection than LifeLock advertises. The Terms and Conditions state that LifeLock "will not be liable for any special, incidental, indirect or consequential damages of any kind, nor any damages whatsoever other than as set forth in our Service Guarantee."

28.     The Service Guarantee, as contained in the Terms and Conditions, similarly disclaims such liability and has inconsistent terms concerning the scope of its coverage, stating:

> If you are our client when someone accesses your personal identifying information and subsequently uses it without your authorization to commit a fraud, due to a failure or defect in our Service, and you have complied with this Agreement, subject to the terms herein, we will pay professionals to assist in restoring any such loss or recover such expenses, as required,

provided however that the maximum limit of our Service Guarantee is $1 (one) million per lifetime for all incidents in the aggregate.

. . . .

WE WILL PAY UP TO $1,000,000 TO CURE THE FAILURE OR DEFECT IN OUR SERVICE, PER CLIENT, PER LIFETIME FOR ALL INCIDENTS IN THE AGGREGATE, REGARDLESS OF CIRCUMSTANCE...WE WILL NOT MAKE PAYMENTS TO YOU FOR ANY LOSS YOU MAY INCUR. OTHER THAN OUR SERVICE GUARANTEE, AND EXCEPT AS OTHERWISE SET OUT HEREIN WE MAKE NO REPRESENTATION OR WARRANTY ABOUT OUR SERVICE OF ANY KIND, AND WE DISCLAIM ANY IMPLIED WARRANTIES OUTSIDE OF OUR SERVICE GUARANTEE, SUCH AS A WARRANTY OF MERCHANTABILITY OR FITNESS OF OUR SERVICE FOR ANY PARTICULAR PURPOSE.

29.    The Terms and Conditions and Service Guarantee contain inconsistent and confusing terms that are intended to mislead consumers and allow LifeLock to avoid fulfilling its promises.  By disclaiming all consequential damages, and stating that it will only pay money "to cure the failure or defect in our service," LifeLock intentionally informs consumers that LifeLock is not liable for anything beyond curing a defect in their service – which could only mean correcting a failure to properly place a fraud alert or remove the consumer from a junk mail list.  This language is intended to mislead and deter members from asking LifeLock to cover losses or pay for consequential damages such as hiring professionals to restore their losses, and to provide LifeLock with a basis for denying any such claims.

30.    Notwithstanding LifeLock's efforts to mislead consumers, deter claims and avoid liability through such provisions, the Service Guarantee, properly construed under Arizona law, requires LifeLock to pay professionals to attempt to restore losses from an identity theft resulting from a failure or defect in LifeLock's services.  Under Arizona law, the Service Guarantee, therefore, provides coverage beyond the actual value of LifeLock's service and constitutes insurance against identity theft.

31.    Under the Arizona Insurance Code, an entity selling insurance is required, among other things, to submit its rates to the Department of Insurance for approval, sell its

product using licensed insurance agents, and maintain adequate reserves to pay claims. Upon information and belief, LifeLock has not complied with these provisions, or even attempted to comply with any aspect of the Arizona Insurance Code.  In fact, LifeLock attempts to disclaim its responsibilities by stating that it is not an insurer in its Terms and Conditions, when in fact it is offering a form of insurance.

32.     Even properly construed to require LifeLock to pay professionals to attempt to restore losses from an identity theft, the Service Guarantee still provides far less coverage than LifeLock advertises.  The only conceivable time when the Guarantee would come into effect is when LifeLock failed to place the alerts or remove the consumer from lists, and the consumer can prove that the identity theft and the specific loss occurred as a result of that failure – a narrow set of circumstances that will not cover many potential identity thefts that could occur to a member of LifeLock.  For example, LifeLock's guarantee would not be triggered if a person's identity was stolen while a fraud alert was in effect, even though there are multiple situations in which that could happen – as the theft of Davis' identity aptly demonstrates.  This can happen because the creditor failed to fulfill its obligation to confirm the consumer's identity, the theft involved accounts already in existence, or the theft involved establishing new accounts that do not require accessing a credit report.

33.     In addition, even when the Guarantee is triggered, LifeLock will not "do whatever it takes," "spend up to $1,000,000.00 to make it right," or "cover all losses and all expenses up to one million dollars," as promised in the advertising.  The Terms and Conditions expressly disclaim any "special, incidental, indirect or consequential damages," and the company will not directly repay losses and thefts that a victim of identity theft experiences.  Rather, at most, LifeLock would be required to hire professionals to attempt to recover or restore losses without actually covering the losses as promised on the website and in its advertisements.

34.     In addition, although LifeLock promises to hire "the best" lawyers, the Terms and Conditions gives LifeLock sole discretion in choosing all professionals under the

Service Guarantee.  Upon information and belief, LifeLock does not hire the best attorneys to represent members who have been victims of identity theft and are attempting to recover their losses.

35.     The false, misleading and fraudulent misstatements and omissions made by LifeLock were material to the contract and were an inducing cause for Plaintiffs entering into the contract.

36.     Plaintiff, an attorney, subscribed to LifeLock in October 2007.  Since then, Plaintiff has paid LifeLock ten dollars per month for each month of service.  After his vehicle, which contained personal identification such as a driver's license, was stolen, Plaintiff subscribed with LifeLock.  During his sign-up call with LifeLock, Plaintiff was informed that he would be protected against any attempts to steal his identity or procure credit under his name using the information stolen from his truck.

37.     Based on LifeLock's advertisements and representations, Plaintiff's impression was that LifeLock would, among other things, cover any type of loss related to the theft of his identity.

38.     Plaintiff also understood, based on LifeLock's advertisements and representations, that LifeLock would require entities extending credit to contact him to verify his identity prior to extending new credit to those purporting to be him.  In accordance with this understanding, Plaintiff submitted his personal information to LifeLock, including numbers at which he was to be reached in the event of an attempted identity theft.

39.     Plaintiff was not aware that LifeLock was not permitted to submit fraud alerts on his behalf and LifeLock did not advise Plaintiff of this fact.

40.     This case is not subject to arbitration because the arbitration clause in the Terms and Conditions between LifeLock and putative class members is substantively and procedurally unconscionable, violates public policy and exceeds the reasonable expectations of the parties.  Furthermore, Defendant knew or should have known that the arbitration clause would have exceeded Plaintiff's reasonable expectations.

11

1

## V.     COMMON COURSE OF CONDUCT EMANATING FROM ARIZONA

2      41.     Plaintiff's agreement with LifeLock, as described below, is substantively

3  analogous to all other agreements entered into by LifeLock and putative class members.

4      42.     Upon information and belief, LifeLock created, adopted, ratified,

5  implemented, and/or administered a common course of conduct whereby it created an

6  advertising scheme to unlawfully induce consumers into purchasing LifeLock through the

7  use of false and misleading statements, and material omissions.

8      43.     LifeLock's unlawful scheme to mislead consumers across the country was

9  created, adopted, ratified, and implemented, upon information and belief, at its corporate

10  headquarters in Tempe, Arizona.  Accordingly, all actions that give rise to this complaint

11  emanate from Tempe, Arizona, to include LifeLock's pattern and practice of deceptive

12  behavior.

13      44.     A resolution of LifeLock's liability to Plaintiff will resolve the issue for all

14  other putative class members.

## VI.     CLASS ACTION ALLEGATIONS

15

16      45.     Plaintiff brings this action against LifeLock as a class action pursuant to

17  Federal Rules of Civil Procedure 23(a) and 23(b)(2) and 23(b)(3).  This action may

18  properly be maintained as a class action because it satisfies the numerosity, typicality,

19  adequacy, predominance and superiority requirements of Rule 23.

20      46.     "The Class" proposed consists of all individuals who subscribed to

21  LifeLock's services.

22      47.     The requirements of subparts 23(a), (b)(2) and (b)(3) are met as follows:

23  **A.     Numerosity**

24      48.     Although the exact size of the class is unknown, Plaintiff believes the class

25  numbers in the hundreds of thousands.  According to news reports and other public

26  documents, LifeLock has added new members at rates as high as several thousand a day,

27

28

and has a total membership of approximately 900,000.  Given these numbers, numerosity is clearly satisfied.

**B.     Commonality**

49.     There are numerous questions of law and fact common to the class, including, but not limited to:

a.     Whether LifeLock made false or misleading statements or omissions concerning its ability to place fraud alerts on behalf of members;

b.     Whether LifeLock made false or misleading statements or omissions about the right of consumers to have fraud alerts placed on their credit reports and to perpetually renew those fraud alerts;

c.     Whether LifeLock made false or misleading statements or omissions about the value of fraud alerts and their ability to protect consumers from identity theft;

d.     Whether LifeLock made false or misleading statements or omissions about the value and scope of its $1,000,000.00 Service Guarantee;

e.     Whether LifeLock's statements or omissions violated the Arizona Consumer Fraud Act;

f.     Whether LifeLock's activities breached the contract it formed with its members; and

g.     Whether Arizona law governs all claims against LifeLock.

**C.     Typicality**

50.     Plaintiff's claims are typical of the claims of the class as a whole.  Plaintiff has the same interests in this matter as all other members of the class, and his claims are typical of all members of the class.  Plaintiff and all class members have sustained damages arising out of LifeLock's common course of conduct as outlined above, and the damages of each class member were caused by the same misconduct.

**D.      Adequacy**

51.      Plaintiff will fairly and adequately protect the interests of the class.  The interests of Plaintiff are coincident with, and not antagonistic to, those of the remainder of the class.  Plaintiff is committed to pursuing the action and has obtained counsel experienced and qualified to prosecute this action and class actions generally.

**E.      Common Questions Predominate, and the Class Action Device Is Superior**

52.      Prosecution as a class action will eliminate the possibility of repetitious litigation, while also providing redress of claims too small to support the expense of individual claims.

53.      Class treatment is also appropriate because LifeLock has acted uniformly with respect to all class members.

54.      Further, the questions of law and fact common to the members of the class predominate over any questions affecting any individual member, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy between Plaintiffs and LifeLock.

55.      Joinder of all class members who are geographically dispersed and number, upon information and belief, in the hundreds of thousands is impracticable.  Furthermore, the expense and burden of individual litigation makes it impractical to redress the wrong done to them on an individual-by-individual claim basis.  Upon information and belief, members of the class are not already engaged in litigation concerning this controversy.  This is a desirable forum, as it is home to a large number of class members and the conduct that gives rise to this action took place in Arizona.

## VII.    CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Violation of the Consumer Fraud Act)

56.      Plaintiff realleges the preceding paragraphs as if fully set forth herein.

57.    LifeLock's advertising and website made use of deception, false promises, misrepresentations and material omissions in connection with the sale and advertisement of its services, in violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. § 44-1522(A).

58.    LifeLock used false, deceptive and misleading statements, and omitted material facts, concerning the scope of its alleged $1 million guarantee. LifeLock, through its advertising, informed and led consumers to believe that the guarantee would cover all losses resulting from any identity theft experienced by a member of LifeLock, when in reality the guarantee will not cover any losses experienced by a member. Instead, it will only provide coverage when the consumer can prove that the theft occurred as a result of LifeLock's failure to provide the promised service, and consists, at most, of hiring professionals to attempt to restore losses rather than covering the losses themselves, and even then only if those expenses are related to a defect in the service itself.

59.    LifeLock's guarantee purposely used inconsistent and confusing terms within its Terms and Conditions and Service Guarantee so as to confuse consumers, provide LifeLock with a basis to deny claims from members who experience identity theft, and deter members from bringing legitimate claims.

60.    LifeLock also used false, deceptive and misleading statements, and omitted material facts, concerning the availability, purpose and scope of fraud alerts; LifeLock's ability to place such alerts under the FCRA; and the ramifications of such alerts on the consumer's credit score, creditworthiness, credit report, credit file, and ability to secure credit. For example, LifeLock omits from its advertising the fact that corporations such as LifeLock are not authorized to place fraud alerts on behalf of consumers under the FCRA. LifeLock also fails to disclose in its advertising that consumers are only entitled to place and renew fraud alerts when they have a good faith belief that they are or are about to be the victim of fraudulent activity, burying a statement that each member has such a belief in the Terms and Conditions of the agreement. In addition, LifeLock tells consumers that fraud alerts will not affect their credit worthiness or ability to secure credit, when in fact they may.

61.     Likewise, LifeLock's advertisements and promotions were misleading, false and deceptive, and contained material omissions, regarding the efficacy of LifeLock's services. For example, the FCRA does not require merchants to call the consumer before extending credit when a fraud alert is in place, as LifeLock states it does. Fraud alerts also do not protect against many forms of identity theft which do not involve opening new accounts or accessing credit reports. In addition, LifeLock's claim that it will hire "the best lawyers" to protect a consumer's good name in the event of identity theft is false and misleading in that LifeLock reserves sole discretion to choose all professionals and does not, upon information and belief, hire the best attorneys available to restore losses resulting from identity theft.

62.     LifeLock's advertisements featuring Todd Davis giving out his real social security number as a way to prove that LifeLock's service is effective, including the statements that he has complete confidence in LifeLock's protections and that "LifeLock helps keep your personal information safe, even in the wrong hands," were false and misleading, and contained material omissions, given that Davis' identity was stolen.

63.     As a result of LifeLock's misrepresentations and false statements, LifeLock's members enrolled with LifeLock and paid LifeLock's fees.

64.     LifeLock's members were injured by LifeLock's false promises and misrepresentations, and sustained damages in an amount to be proven at trial. These damages consist, at a minimum, of paying monthly charges for services that were not as represented, paying for insurance that was sold illegally and was not rate regulated, paying for a service that is illegal for a company such as LifeLock to perform, and having their creditworthiness or credit adversely affected because of Defendant's services.

## SECOND CAUSE OF ACTION
**(False and Misleading Advertising of an Insurance Product)**

65.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

66.     Through its website and advertising, LifeLock represented to all consumers that it could protect the identity of its members and that it would guarantee its services up

16

to $1 million.  However, the actual coverage provided under the terms of the policy is dramatically less than what LifeLock represents in its advertisements.

67.     Although LifeLock intentionally used inconsistent and misleading terms in its agreements and stated that it disclaimed all consequential damages and would pay only to cure a defect in its service, the language of the Service Guarantee as properly construed under the laws of Arizona requires LifeLock to provide coverage beyond curing a defect in its service, and constitutes insurance.  By promising to pay professionals to restore losses associated with an identity theft resulting from a failure or defect in its service, LifeLock assumes the risk of such losses, distributes such losses among all its members, and finances this scheme out of the fees paid by members.

68.     In advertising its services and its Service Guarantee, LifeLock made, issued, circulated and caused to be repeated statements that misrepresented the terms of the policy of insurance.  LifeLock stated in its advertising that its Service Guarantee would cover all losses and all expenses up to $1 million any time a member's identity was stolen. However, in reality, LifeLock will not pay for any losses or damages experienced by a member who is a victim of identity theft under any circumstances.  The only protection actually provided under the policy is that LifeLock will pay other professionals to attempt to restore such losses, but even then, only when the consumer can prove that the theft and the loss resulted from a failure or defect in LifeLock's service, not anytime their identity is stolen, as LifeLock advertises.

69.     In addition, LifeLock fails to disclose that its insurance policy is not sold by licensed agents or regulated by the Department of Insurance as required by law.

70.     LifeLock's misleading and false statements violate Ariz. Rev. Stat. § 20-443(1), which forbids making, issuing, circulating, or causing to be made, issued or circulated any statements "misrepresenting the terms of any policy issued."

71.     As a result of the aforementioned conduct, LifeLock's members were injured by LifeLock's false promises and misrepresentations concerning the terms of its insurance,

and sustained damages to be more fully proven at trial, including but not limited to all fees paid to LifeLock for its alleged services.

## THIRD CAUSE OF ACTION
### (Rescission)

72.     Plaintiff realleges the preceding paragraphs as if fully set forth herein.

73.     Through its website, advertising, and the terms and conditions of its agreement with members, LifeLock offered to protect the identity of its members by, among other things, placing and renewing 90-day fraud alerts on members' credit reports, and providing a $1 million Service Guarantee.

74.     Plaintiff and class members accepted that offer and provided consideration through enrollment and payment of the fee.

75.     LifeLock, therefore, formed contracts with Plaintiff and all class members.

76.     However, LifeLock could not fulfill its promise under the contract without violating the FCRA, as it is not authorized to place fraud alerts, and did not adequately ascertain whether its members have the necessary good faith belief that is required to qualify for a fraud alert (i.e., that members are or are about to be victims of fraud or identity theft).

77.     Because LifeLock's promises required it to violate federal law, the object of the contract was illegal, and Plaintiff and all class members are entitled to have the contract rescinded and to have all fees refunded.

78.     LifeLock's promises also violated public policy, and therefore the contract is null and void and must be rescinded and all fees paid must be refunded to Plaintiff and class members.

79.     In addition, LifeLock made material misrepresentations about the agreement and its services.  LifeLock misrepresented to consumers that (1) it could place fraud alerts on their behalf, even though it could not under the terms of the FCRA, (2) all consumers are entitled to place and renew such fraud alerts, without informing consumers that they must have a good faith belief that they are about to be the victim of fraudulent activity (3)

the fraud alerts would protect them from identity theft and that all creditors would be required to call the consumer before providing credit, even though that is not accurate, (4) the perpetual renewal of such fraud alerts would have no effect on their creditworthiness, credit score, or ability to secure credit, even though that is not the case, and (5) LifeLock would guarantee consumers for up to $1 million against any losses or any expenses resulting from an identity theft, when in fact LifeLock will not pay for any losses.

80.    LifeLock's statements were standardized material misrepresentations about the nature and terms of the contract, which induced Plaintiff and class members to enter into the contract and become members of LifeLock.

81.    Plaintiff and class members are therefore entitled to rescission of the contracts based on those material misrepresentations.

82.    Plaintiff and all class members sustained damages as a result of LifeLock's illegal contract and conduct, including but not limited to, all fees paid to LifeLock.

## VIII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff on behalf of himself and the class prays for judgment against Defendant and that, as part of that judgment, the Court:

A.    Certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) and (b)(3);

B.    Award Plaintiff and each class member appropriate damages;

C.    Declare that all contracts are rescinded and order that all monies paid to Defendant be returned to the class because Defendant procured the contracts in violation of state and federal law;

D.    Award pre- and post-judgment interest to Plaintiff and class members;

E.    Award Plaintiff the costs of bringing this action and reasonable attorneys' fees;

F.    Award Plaintiff and class members exemplary damages as are appropriate to deter and punish such acts;

1          G.      Order that Defendant be enjoined from collecting insurance premiums in

2    violation of Arizona law and engaging in unfair and/or deceptive acts or practices as set

3    forth in this complaint; and

4          H.      Such other relief as the Court deems just and proper.

5

6          RESPECTFULLY SUBMITTED this 27th day of March, 2008.

7                          HAGENS BERMAN SOBOL SHAPIRO LLP

8

9

10                         By  s/Robert Carey

11                               Robert B. Carey
                                 Leonard Aragon

12                               2425 East Camelback Road, Suite 650
                                 Phoenix, Arizona 85016

13

14                               J. Grant Woods

15                               GRANT WOODS, PC
                                 1726 North Seventh Street

16                               Phoenix, Arizona 85006

17                         *Attorneys for Plaintiff Byrl Lane*

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28